UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| GAIL EVANS, | ) | Civil Action No.: 4:03-3939-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| WILLIAMSBURG TECHNICAL | ) | |
| COLLEGE; CLIFTON ELLIOTT, aka | ) | |
| "RUSTY" ELLIOTT, Individually and in | ) | |
| His official capacity as agent and Dean of | ) | |
| Instruction of Williamsburg Technical | ) | |
| College; and RONALD HAMPTON, in | ) | |
| his official position as Acting President | ) | |
| of Williamsburg Technical College, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Gail Evans (Mrs. Evans) originally instituted this action on December 15, 2003,

alleging causes of action for quid pro quo sexual harassment, failure to promote, unlawful

termination, retaliation, and hostile work environment pursuant to Title VII, 42 U.S.C. § 2000e, et.

seq., violation of equal protection rights pursuant to 42 U.S.C. § 1983[1], and a state-law claim for

intentional infliction of emotional distress.  This action was stayed for approximately fifteen months

pursuant to the Servicemembers Civil Relief Act of 2003, 50 App. U.S.C. § 522, while Defendant

Clifton "Rusty" Elliott (Mr. Elliott) was deployed in the Middle East in support of Operation Iraqi

Freedom.  On May 20, 2005, Mrs. Evans filed an amended complaint, noting her receipt of the

---

[1]During the hearing on November 9, 2006, Plaintiff's counsel argued that Plaintiff was
asserting a conspiracy claim under 42 U.S.C. § 1985.  However, the supplement that the Plaintiff
provided on November 13, 2006, indicated, "as stated in the Plaintiff's Memorandum in
Opposition to Summary Judgment, the defendants are in error regarding a 1985 claim; it is a
1983 claim."  Plaintiff's Supplement (#79) at 8.

Notice of Right to Sue from the Equal Employment Opportunity Commission regarding her retaliation claim. The matter is now before the court on Defendants' motion for summary judgment and memorandum in support thereof, which were filed June 16, 2006. On July 11, 2006, Mrs. Evans filed an opposition memorandum to Defendants' motion, to which Defendants replied on July 18, 2006. On November 9, 2006, a hearing was held on this motion. This matter is now ripe for disposition.

## FACTS

Mrs. Evans is a white female who holds a Masters Degree in Education. Mrs. Evans was hired by Dr. James Williamson, President of Williamsburg Technical College, in May of 1997. From May of 1997 through May of 2002, Mrs. Evans taught English and Early Childhood Development courses as an adjunct professor at Williamsburg Technical College (the College). During the majority of the time Mrs. Evans was employed by the College, Defendant Clifton "Rusty" Elliott (Mr. Elliott) was the Dean of Instruction and Dr. James Williamson was the President.[2]

The position of adjunct professor is part-time and temporary. Evans Dep. at 13; Elliott Dep. at 13; Williamson Dep. at 9. Adjunct professors enter into a new Agreement for Temporary Employment (Agreement) each semester. Ex. 1 to Defendants' Motion. The Agreement provides that "nothing in this agreement or in the parties' employment relationship, including repeated employment as a temporary employee, gives the employee a right to continued employment with Williamsburg Technical College beyond the terms of this agreement." Id. The Agreement also provides that its is subject to termination upon insufficient enrollment or funding, unavoidable changes in course assignments necessary to give a full-time employee a full load, unavoidable

---

[2]Defendant Ronald Hampton is the current President at the College.

changes in course offerings or scheduling, unsatisfactory performance, or failure to abide by policies and procedures that govern the College.  Id.

Mrs. Evans sets forth her allegations in her Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Amended) (Docket # 69) as follows:

> Plaintiff had been approached by Defendant Elliott on several occasions indicating that he desired a relationship beyond the normal employer-employee relationship, subjected her to sexually suggestive comments and improper physical sexual contacts, that said relationship and sexual comments and contacts were the "quid pro quo" in exchange for her to continue in her position and advancement opportunities, which Plaintiff believed she had to consent if she desired to continue her employment at the Defendant College; said sexual harassment had a substantial detrimental effect on Plaintiff's employment and psychological well-being.

> Plaintiff has been sexually discriminated against, sexually harassed and retaliated against because of her sexual relationship with Defendant Elliott, such actions also has caused a hostile environment for Plaintiff in her work place, which management knew or should have known, as such harassment was pervasive and obvious, but did nothing to stop, causing her emotional trauma, embarrassment and humiliation.

> Plaintiff was further retaliated and discriminated against by the Defendants after information regarding the sexual relationship between her and Defendant Elliott was provided to the administration of the college.

> Plaintiff was subjected to disparate and retaliatory terms and conditions of employment and harassed as her duties changed to the point where she was demoted as classes she had taught were taken from her, the denial of access to promotions and the denial of promotions, including, but not limited to the denial of a full time teaching position; and Defendants and its agents made and published derogatory statements regarding Plaintiff.

> Plaintiff's employment was also terminated on May 16, 2002 by the Defendant College in violation of her rights; and due to the sex discrimination and the retaliation she suffered at the hands of the Defendants.

> Defendant Elliott, also in retaliation for Plaintiff's protected activity and in furtherance of sexual discrimination, even filed criminal charges of "stalking" against the Plaintiff in state court shortly after receiving a copy and being notified of the "Plaintiff's Notice of Right to Sue" for sex discrimination, in an attempt to prevent her from filing a suit concerning the sex discrimination by him and the Defendant College, causing her emotional trauma, embarrassment and humiliation.   The Plaintiff filed a Charge of Discrimination on retaliation on July 6, 2004; and received her "Notice of Right to Sue" from the E.E.O.C. on August 13, 2004. The Plaintiff's Amended Complaint was filed within 90 days after receipt of that notice.

In her opposition memorandum, Mrs. Evans provides no affidavits nor cites to any other evidence in the record to support these allegations. At the hearing held November 9, 2006, the undersigned allowed Plaintiff's counsel until November 15, 2006, to supplement his memorandum by providing references to the portions of the record that support his argument. The undersigned directed Plaintiff's counsel to point to facts in the record and indicate which claims those facts support. On November 15, 2006, Plaintiff's counsel filed page and line designations from the depositions of Ms. Evans, Mr. Elliott, and Dr. Williamson and indicated in parentheses which claims each portion of the deposition supported. Document # 79.

Mrs. Evans testified that, on the day she was fired, she told Dr. Williamson of her relationship with Mr. Elliott, and that he did nothing to investigate her version. She described her discrimination claim as follows:

> A.     It's sex discrimination and later it became retaliation also, and its all based upon the sexual affair I had with Rusty Elliott, the Dean of Instruction because of his wife's jealousy of me.
> Q.     Why do you believe it was sex discrimination?
> A.     Because I was fired and Mr. Elliott is still sitting in his position. He had sex with me. He did the same thing and he's still there and I'm not. See, Dr. Williamson needed Mr. Elliott to do his work for him but I could easily be replaced.

Evans Dep. at 54-55.

Mrs. Evans also testified that Dr. Williamson told her she was fired "because of erratic, odd, bizarre behavior in three days' time." Id. at 43. The following colloquy followed:

> Q.     What do you mean three days' time, Mrs. Evans?
> A.     He based it on three days' time. The three days preceding May 16th. He was aware, but they were only a few people aware, of my back injury. Only Dr. Williamson, Dr. Gary Carney, Mr. Eric Brown, Mr. Rusty Elliott and Mr. Mel Price knew about my back injury. I didn't even tell the students.

Id. at 43-44.  Mrs. Evans did not deny that she engaged in such behavior.

She testified she was harassed as follows:

> Q.    Mrs. Evans, do you believe that you were sexually harassed while you were
>        employed at Williamsburg Technical College?
> A.    I was harassed by Mr. Elliott's wife's friends.  I don't know if you call it
>        sexual.

Id. at 45-46.  She described the harassment as follows:

> A.    I was harassed by janitors using radios, watching my every move and
>        reporting it to Mrs. Elliott, people calling from one building to the other to
>        Mr. Henry McElveen when my class ended, whether I was talking to a
>        student.  Barbara McKenzie tore down the paper to my classroom that Mel
>        Price had suggested I put up to cover my windows to avoid them making fun
>        of me.  That is definitely harassment by employees.
>
>                              * * *
>
> Q.    Were you ever harassed by Rusty Elliott?
> A.    Well, if you call sex harassment, yes.
> Q.    Did you want sex from Rusty Elliott?
> A.    I didn't want it.  He wanted me to go on conferences with him.  He invited
>        me to conferences in Spartanburg and Columbia.  I never went on either one.
>        I called him in Columbia.  He also wanted me to leave my classroom, English
>        at night and come to his office and make love to him or be with him and I
>        wouldn't do that either.

Id. at 46, 48-49.

Mrs. Evans believes that Monica Elliott had her fired because she was suspicious that she

was having an affair with her husband.  Id. at 42.  She testified that Monica Elliott got her friends

to write false statements about her to get her fired.  Id. at 42, 50.  When asked by Defense counsel,

"[d]o you believe you were retaliated against by the college," Mrs. Evans responded, "[n]ot the –

most people at the college liked me very much.  It's just Monica's friends that were – perhaps

disapproval of what they thought was a relationship and some which Mr. Rusty Elliott will agree, were professionally jealous of my success with my students and excellent evaluations." Id. at 49.

Mrs. Evans testified that, at the end of her employment with the College, she and Mr. Elliott were still good friends: "He was helpful to me to the very end, and I was helpful to him to the very end." Id. at 43.

In her deposition, Mrs. Evans stated that Mr. Elliott was extremely friendly and appeared to be overly interested in her the first time they met at the College, which was in May of 1997. Evans Dep. at 14-15; 17. She also testified that Mr. Elliott was kind and helpful. Id. at 25. Mrs. Evans also describes several sexual encounters between her and Mr. Elliott in great detail. According to Mrs. Evans, her first sexual encounter with Mr. Elliott occurred in early May of 1998. Id. at 23-24. She stated that she felt "unusual" after the first encounter but was flattered that Mr. Elliott was interested in her. Id. at 26.

The next sexual encounter between Mrs. Evans and Mr. Elliott occurred soon after the first in May of 1998. Id. at 26. Mrs. Evans stated that she felt "surprised" after that episode. Id. at 27. The third sexual encounter occurred at the end of May of 1998. Id. at 32. Two more encounters occurred in June of 1998. Id. at 37; 56-57. The final sexual encounter was in May of 2000. Id. at 59. During that final encounter, Mrs. Evans told Mr. Elliott that she had waited so long "for this." Id. at 61-62. Each of these encounters occurred during the day in Mr. Elliott's office with his door closed. Id. at 23-24, 26-27, 32, 37, 58, 61. In May of 2002, Mrs. Evans exposed her breast to Mr. Elliott because "[they] had that kind of a relationship." Id. at 66-67. Mrs. Evans alleges that Mr. Elliott wanted to continue the relationship outside the College but she did not. Id. at 48-49.

In responding to why she engaged in the sexual relations with Mr. Elliott, Mrs. Evans testified, "Mr. Elliott is my administrator and, yes, sir, I was attracted to Mr. Elliott. I was flattered that he was interested in me. But I also felt the pressure that he was my administrator and I must do what he wants me to do to please him." Id. at 29. She testified that she did not "want" sex from Mr. Elliott. He wanted to relationship to expand away from campus, but she did not allow it. Id. at 49. She wanted a friendship and appreciated his authority but did not "want any full blown affairs." Id.

However, beginning in October of 1997, Mrs. Evans wrote notes telling Mr. Elliott that she had "fallen hopelessly in love with [him]." Id. at 36. She testified that the relationship was consensual. Id. at 40.

Mrs. Evans never complained to anyone about her relationship with Mr. Elliott, but she did complain about the harassment by other people, including Monica Elliott, Barbara McKenzie and the janitors. She told Mel Price and Mr. Elliott about the treatment by the other employees at the College before the end of her employment with the College; She told Dr. Williamson and Eric Brown on the day she was fired. Id. at 41, 46. Mrs. Evans stated that the only person she told about her relationship with Mr. Elliott while she was employed with the College was her chiropractor, Dr. Gary Carney, who is also the music professor at the College. Id. at 40-41.

Mr. Elliott characterizes the relationship he had with Mrs. Evans significantly different. According to Mr. Elliott, from the beginning of her employment at the College, Mrs. Evans had an interest in a romantic relationship with him. He provided affidavits from the two assistants he had between May of 1997 and May of 2002, Rosa Harvin and Judy Coker, who maintained a desk directly outside Mr. Elliott's office and who could monitor the people who entered his office. Ex. 2 and Ex. 3 to Defendants' Motion. Both Ms. Harvin and Ms. Coker averred that Mrs. Evans

frequently visited Mr. Elliott in his office, that she would stand so close to him while he was in his chair that he would try to roll his chair into a corner to get away from her, that Mr. Elliott instructed them to keep the door open at all times while Mrs. Evans was in his office and to remind him of fictitious "meetings" so that she would have to leave, that Mrs. Evans would not leave when Mr. Elliott was reminded of the "meetings" and would block him from being able to get out of his desk chair, and that, if Mr. Elliott was not in his office, Mrs. Evans would sit in his office in his chair to wait for him. Ex. 2 and Ex. 3 to Defendants' Motion. Ms. Coker further averred that Mr. Elliott informed her that he was uncomfortable with Mrs. Evans' advances toward him, that she never witnessed Mr. Elliott make any suggestive advances, gestures or comments towards Mrs. Evans, that after her contract was not renewed, Mrs. Evans started walking her dog at the College and would sit on the ground and wait for Mr. Elliott to come out for a cigarette break, and that, if he saw her outside, Mr. Elliott would either stay inside or go to another exit so that Mrs. Evans would not see him. Ex. 3 to Defendants' Motion.

Mrs. Evans expressed her feelings for Mr. Elliott with many cards and letters. Ex. 4 to Defendants' Motion. The cards included phrases like "[t]o prove my sincere devotion, I wrote a 100-word composition on the subject of love, just for you, Dear," "[l]ove and lots of kissing! See what you are missing," "I like you beary, beary much," and "I love our relationship! Its such a challenge!" Id. The cards were signed with salutations such as "with enduring love," "with eyes only for you," "your peppy puppy," "lovingly," "lots of love," "your merrymaking mouse," "your duckling," "your cuddly cub," "your honey hare," "your playful puppy," and "love and kisses." Id. One card states, "If you're waiting for me to apologize to you . . . you've waited long enough. I'm sorry," to which

-8-

Mrs. Evans adds, "Rusty, I have realized the errors of my many ways, and this applies to my past actions and words as well as to my present and future actions and words." Id.

In addition to the cards, Mrs. Evans also sent letters to Mr. Elliott in which she expressed feelings such as, "I don't like days now without your presence," "I waited for you . . . .  I'm so sad that I missed you.  Stay handsome and happy until I see you again," and  "I love you and I'll miss you until Monday.  You light up my life! . . . I wish I could be with you." Id.  Two letters in particular indicate the possible one-sidedness of the relationship between Mrs. Evans and Mr. Elliott. One states,

> Rusty,
>
>    I know I don't seem very important to you, but you are very important to me. You are all I've got, and you are the main reason that I endure what I have to take from other employees here.  I'm crying now, but I'll be okay.  I just cannot bear to leave you.  I'm very physically, mentally, and spiritually attracted to you.  Please try to understand me.  I truly am a kind generous person who loves you very much.  God bless you.
>
> Gail
>
> P.S.  Someday I hope you will admire and love me for my courage.  Please don't make fun of me.

Id.  The other letter states,

> Rusty,
>
>    I'm sorry if I'm embarrassing you.  However, I really do love you very much. Please do not make fun of me, but the only reason that I'm here is because of you. I turned down 2 other more lucrious [sic] positions to be here some of the time with you.  That is also why I pushed Mr. Campbell to put my classes during the day.  That is, I wanted to be here when you are here.  I know this sounds ridiculous to you, but it's the truth, and its important to me.
>
> Gail

Id.    Mr. Elliott showed some of these cards and letters to Mr. Williamson and assured Mr. Williamson that he was not involved with Mrs. Evans.  Williamson Dep. at 20, 24-26.

Following the end of the Winter 2002 semester, Mrs. Evans and Mr. Elliott discussed the possibility of her teaching two English and two Early Childhood Development courses for the Summer 2002 semester, but the parties did not enter into an Agreement for Temporary Employment for that term.  Elliott Dep. at 50-51.  Prior to the start of the Summer 2002 semester, Mr. Elliott determined that one of the four courses that Mrs. Evans was to teach that semester had insufficient enrollment to be offered.  Id. at 51.  Another of the four courses was also in danger of being cancelled, but even if that class eventually achieved sufficient enrollment, Mr. Elliott was required to assign it to Bruce Floyd, a permanent, full time professor at the College.  Id.  The policy at the College was to ensure that each full-time professor maintained a full load of classes before an adjunct faculty member was offered a course.  Id.; Williamson Dep. at 27-28.  Five other adjunct faculty members, including two males, were affected by this policy for the Summer 2002 semester.  Ex. 5 to Defendants' Motion.

On May 13, 2002, the first day of the Summer 2002 semester, Mr. Elliott informed Mrs. Evans of the fact that one of her classes was to be cancelled and another would either be cancelled or given to Mr. Floyd.  Elliott Dep. at 51-52.  Apparently angered by this news, Mrs. Evans informed Mr. Elliott that he could not take "her" course and that she wished to enter a complaint about the matter.  Id. at 52; Ex. 6 to Defendants' Motion.  She then confronted Mr. Floyd in the hall outside of Mr. Elliott's office, glaring and shouting at him and attempting to run into him with her shoulder.  Ex. 6 to Defendants' Motion.

Several employees of the College, including Mr. Elliott and Mr. Floyd, submitted memos to Mrs. Evans' file regarding her behavior following the news that one of her classes would be given to Mr. Floyd.  Ex. 6 to Defendants' Motion.  In a memo dated May 14, 2002, Mr. Floyd stated that

-10-

"I write this letter in order to protest the appalling behavior of Gail Evans yesterday." Id. Mr. Floyd recounted the confrontation that occurred between the two the prior day and described Mrs. Evans' behavior as "irrational and confrontational." Id. He also stated that,

> [a]s Chair of the Arts and Sciences Department and as Head of the English Department, I am disturbed at the boorish and unprofessional behavior of Ms. Evans. It was the behavior of one not in control of her emotions. Her actions, carried out in view of students, were childish and disruptive. It was not the kind of behavior Williamsburg Technical College desires in its employees.

Id.

In another memo dated May 14, 2002, Mr. Elliott documented an encounter with Mrs. Evans during which he told her that she would not need to meet with the English course scheduled for that evening or the one scheduled for the next morning because they were to be cancelled. Id. When Mr. Elliott met with the class that evening to help the students schedule another course, Mrs. Evans was there as well. Id. As Mr. Elliott was speaking with a student, Mrs. Evans parroted every word he said. Id. In addition, although the class had been canceled and a witness saw Mrs. Evans leave at 7:20 p.m., the sign-in sheet for that evening indicated that she signed in at 6:00 p.m. and signed out at 10:00 p.m. Id.

Another memo was submitted to Mrs. Evans' file by Mr. Elliott on May 15, 2002. Id. In that memo, Mr. Elliott noted that Mrs. Evans appeared for class that morning even though Mr. Elliott had told her the day before that she need not meet the class because it had been cancelled. Id. Mrs. Evans also removed a note from the door that indicated to students that the class had been cancelled. Id.

While Mrs. Evans alleges that she was harassed by other employees of the College who were friends with Monica Elliott, Judy Coker and Monica Elliott submitted memos to Mrs. Evans' file

-11-

indicating that she was harassing Monica.  Id.  Mrs. Evans apparently had several encounters with Monica Elliott.  Id.  According to Monica Elliott and Judy Coker, Mrs. Evans approached Monica in the parking lot on the evening of May 14, 2002, and started snapping her fingers in Monica's face and repeating "Hey Monica" over and over again.  Id.  On May 15, 2002, Monica encountered Mrs. Evans on several occasions, during each of which Mrs. Evans would scream in Monica Elliott's face "have a good day" over and over again.  Id.  Later in the day, as Mrs. Elliott attempted to open a classroom door for a student, she realized that it was locked and called someone from maintenance to unlock it.  Id.  At that time, Mrs. Evans yelled to Mrs. Elliott, "You better call reinforcements! You need reinforcements!"  Id.  Mrs. Evans then ran down the hall and out of the building.  Id.

Other employees of the College also witnessed Mrs. Evans' behavior on May 15, 2002. Barbara McKenzie and Mona Dukes both submitted memos to Mrs. Evans' file detailing an event in which Mrs. Evans came up to them and yelled in their faces, "I hope you have a great day today" and then went down the hall talking to herself.  Id.  Ms. McKenzie also noted in her memo that Mrs. Evans had come into the business office, asking, "Do you see any devils out here?"  Additionally, Ms. McKenzie stated that Mrs. Evans was a member of her church and had not been "herself" for quite sometime.  Id.

After reviewing the above-mentioned memos regarding Mrs. Evans' behavior and in light of the low enrollment in the classes Mrs. Evans was to teach, Mr. Williamson decided not to renew Mrs. Evans' employment for the Summer 2002 semester.  Williamson Dep. at 28; Elliott Dep. at 59; Ex. 7 to Defendants' Motion.  However, even after her separation from the College, Mrs. Evans continued to visit the campus on a regular basis to walk her dog on the sidewalks outside of Mr. Elliott's office.  Evans Dep. at 71; Elliott Dep. 27-28; Ex. 3 to Defendants' Motion.  Mrs. Evans also

-12-

called Mr. Elliott and other College faculty and staff with such frequency that she was asked by the College attorney to stop calling the school.  Ex. 9 to Defendants' Motion.

On August 27, 2002, Mrs. Evans wrote a letter to Mr. Williamson explaining that her termination was actually a result of a sexual affair that she had with Mr. Elliott and requesting that she be reinstated as a professor at the College.  Ex. 6 to Defendants' Motion.  Dr. Williamson responded in a letter dated August 30, 2002, in which he reiterated that the reason for the non-renewal of her contract was because of the lack of enrollment in the courses she was to teach.  Ex. 7 to Defendants' Motion.  He denied her request for reinstatement.  Id.  Thereafter, Mrs. Evans filed an employment discrimination charge against the College based upon sex discrimination with the South Carolina Human Affairs Commission and the EEOC.  Ex. 10 to Defendants' Motion.  In the charge, filed November 5, 2002, Mrs. Evans stated

> A.  PERSONAL HARM:
> On May 16, 2002, I was discharged by President, Dr. Jimmie Williamson and Dean of Instruction, Mr. Clifton "Rusty" Elliott.
>
> B.  RESPONDENT'S REASON FOR ADVERSE ACTION(S):
> I was told by Dr. Williamson that I was discharged for unprofessional behavior.
>
> C.  COMPLAINANT'S CONTENTION(S):
> Prior to being discharged on May 16, 2002, I had a consensual sexual relationship with Mr. Clifton "Rusty" Elliott.  Once President, Dr. Jimmie Williamson became aware of this relationship, I was discharged but Mr. Elliott was not.
>
> D.  DISCRIMINATION STATEMENT:
> I believe that I was discriminated because of my sex (female) in violation of the SC Human Affairs Law, as amended, and Title VII of the US Civil Rights Act of 1964, as amended."

Ex. 10 to Defendants' Motion.

-13-

As a result of Mrs. Evans' constant phone calls and frequent visits to the College campus, Mr. Elliott contacted the local authorities who encouraged him to file a complaint. Elliott Dep. at 31-32. Mr. Elliott believed that his complaint would result in the issuance of a restraining order. Id. However, the authorities instead charged Mrs. Evans with stalking and arrested her. Id. Mrs. Evans was arrested after Mr. Elliott received notice that she had filed the first complaint with the Equal Employment Opportunity Commission (EEOC) and had received a Right to Sue letter. Evans Dep. at 70. According to Mrs. Evans, Mr. Elliott had her arrested because he was trying to prevent her from going forward with the case. Id. Mrs. Evans subsequently filed this action on December 15, 2003.

On July 6, 2004, Mrs. Evans filed a second charge with the South Carolina Human Affairs Commission and the EEOC, alleging that

> [i]n November 2002, I filed a complaint of sexual harassment with the South Carolina Human Affairs Commission, charge number 14C-2003-00197 against my employer naming the Dean of the college Clifton "Rusty" Elliott as the harasser. I received my Suit Rights June 30, 2003. October 22, 2003, Elliott had me arrested for "stalking". Elliott was aware of the issuance of the Right to Sue and I believe he was intimidating me to keep me from filing a lawsuit against himself and Willi022022 Technical College.
>
> I believe I have been retaliated against for engaging in a protected activity in violation of my rights as protected by Title VII of the Civil Rights Act of 1964, as amended.

Ex. 11 to Defendants' Motion. On May 20, 2005, after Mrs. Evans received her Right to Sue Notice from the EEOC, she amended her complaint to set forth a cause of action for retaliation.

## DISCUSSION

Mrs. Evans appears to allege causes of action for (1) quid pro quo sexual harassment; (2) failure to promote (disparate treatment); (3) unlawful termination (disparate treatment); (4)

-14-

retaliatory harassment; (5) hostile work environment; (6) violation of Equal Protection and Due Process rights; and (7) intentional infliction of emotional distress.

Defendants seek summary judgment against each of her claims. As to her quid pro quo and failure to promote claims, Defendants seek dismissal pursuant to Rule 12(b)(1), F.R.Civ.P., asserting that Mrs. Evans has failed to exhaust her administrative remedies as to these claims.

### Summary Judgment Standard

Defendants filed their motion for summary judgment pursuant to Rule 56, FRCP. The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet

"the substantive evidentiary standard of proof that would apply at a trial on the merits." <u>Mitchell v. Data General Corp.</u>, 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." <u>See</u> <u>also</u> <u>Celetex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves").  To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings.  Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." <u>Celetex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  <u>See also</u> <u>Cray Communications, Inc. v. Novatel Computer Systems, Inc.</u>, 33 F.3d 390 (4th Cir. 1994); <u>Orsi v. Kickwood</u>, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

### *Rule 12(b)(1) Standard*

When a  Rule 12(b)(1) motion is raised as to the factual basis for subject matter jurisdiction, the plaintiff bears the burden of proving jurisdiction exists.  <u>Richmond, Fredericksburg & Potomac R. Co. v. U.S.</u>, 945 F.2d 765, 766 (4th Cir.1991).  When evaluating a challenge to jurisdiction under Rule 12(b)(1) the court can go beyond the face of the complaint and consider evidence without converting the proceeding to one for summary judgment.  <u>Adams v. Bain</u>, 697 F.2d 1213, 1219 (4th Cir.1982); <u>see  also</u> <u>Richmond, Fredericksburg & Potomac R. Co.</u>, 945 F.2d at 768.  It is well-established that parties must exhaust prescribed administrative remedies before the federal

courts have jurisdiction over the issues raised.  See McCarthy v. Madigan, 503 U.S. 140, 144-45, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); Guerra v. Scruggs, 942 F.2d 270, 276 (4th Cir.1991).

***Discrimination Claims in General***

There are two methods of proving a case of intentional discrimination under Title VII: the method set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (mixed-motive) and the method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)(pretext).

Under the McDonnell Douglas[3] analysis, a plaintiff has the initial burden of demonstrating a prima facie case of discrimination.  To establish a prima facie case, a plaintiff must show (1) she is a member of a protected class; (2) she was qualified for her job and she was performing her job at a level that met her employer's reasonable expectations; (3) she suffered an adverse employment action; and (4) the position remained open of was filled by similarly qualified applicants outside the protected class.  Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004).  Under some circumstances, the fourth element can be established by presenting evidence raising an inference of discrimination.  See Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir. 2005); EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001)(citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)).  In a disparate discipline case, the fourth prong may be satisfied by establishing that other employees who are not members of the protected class were retained under apparently similar circumstances.  Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d

---

[3]  The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

124, 133 (4th Cir. 2002).[4]  Once plaintiff has established a <u>prima facie</u> case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the termination.  <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 ((1981).  This is merely a burden of production, not of persuasion.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993).   Once the defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination <u>vel non</u>."  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000)(citing <u>Postal Service Bd. of Governors v. Aikens</u>, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reasons produced by the defendant were not its true reasons, but were pretext for discrimination.  <u>Reeves</u>, 530 U.S. at 143.  During all of the burden shifting scheme set forth in <u>McDonald Douglas</u>, the ultimate burden of proving that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against her based on her sex.  It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."[5]  <u>Hawkins v. Pepsico</u>, 203 F.3d 274, 279 (4th Cir. 2000) (quoting <u>DeJarnette v. Corning, Inc.</u>, 133 F.3d 293, 299(4th Cir. 1998) ("[T]his Court does not sit

---

[4]  The Fourth Circuit recently discussed the necessity of the standard fourth element. <u>Miles v. Dell, Inc.</u>, 429 F.3d 480, 485-90 (4th Cir. 2005).  Although <u>Bryant</u> was not discussed in <u>Miles</u>, <u>Bryant</u> remains valid law.  <u>See</u> <u>Powell v. Bank of America, N.A.</u>, 2005 WL 2335463, n. 4 (W.D.N.C. 2005) (discussing state of law prior to <u>Miles</u>).

[5]  "Proof that the employer's proffered reasons in unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race discrimination) . . . is correct."  <u>Reeves</u>, 530 U.S. at 146-47.  "It is not enough to disbelieve the [employer]."  <u>Love-Lane v. Martin</u>, 355 F.3d 766, 788 (4th Cir. 2004).  Plaintiff must show a reasonable jury could "believe [her] explanation of intentional race discrimination."  <u>Id</u>.

as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination ...." (internal quotation marks omitted))); <u>Jiminez v. Mary Washington College</u>, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer").  It is the perception of the employer that is critical.  <u>Hawkins</u>, 203 F.3d at 280.  Even a reasoned decision based on incorrect facts is not evidence of pretext.  <u>Pollard v. Rea Magnet Wire Co.</u>, 824 F.3d 557, 559 (7th Cir. 1987), <u>cert</u>. <u>denied</u>, 484 U.S. 977 (1987).

Plaintiff may also proceed under the mixed-motive method of establishing intentional discrimination.   Under this method, a plaintiff must present sufficient evidence, direct or circumstantial, that, despite the existence of legitimate, nondiscriminatory reasons for the adverse employment action, an illegal factor (i.e., gender) was a motivating factor in the decision.  <u>Hill</u>, 354 F.3d at 284-86.  Plaintiff need not show gender was the sole motivating factor but only that it was a motivating factor.  <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003).  The racial bias must come from a relevant decisionmaker.[6]  Also, the protected trait "must have actually played a role in the employer's decision making process and had a determinative influence on the outcome."  <u>Hill</u>, 354 F.3d at 286.

### *Exhaustion of Administrative Remedies*

Before the merits of Mrs. Evans' claims can be addressed, the Court must first consider Defendants' argument that Mrs. Evans has failed to exhaust her administrative remedies as to her <u>quid pro quo</u> and a failure to promote claims.

---

[6]  <u>See</u> <u>Hill</u>, 354 F.3d at 291 ("an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision.").

Before a plaintiff has standing to file suit under Title VII, she must exhaust her administrative remedies by filing a charge with the EEOC.  See Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000).  The EEOC charge defines the scope of the plaintiff's right to institute a civil suit.  Id.  "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination."  Chisholm v. United States Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981).

The scope of a private action is defined by the scope of the administrative charge from which it arises and from any findings that arise out of the investigation of the charge. EEOC v. General Elec. Co., 532 F.2d 359, 365 (4th Cir. 1976).  Therefore, only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent  lawsuit. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962-63 (4th Cir. 1996) (sexual harassment and discriminatory pay and benefits claims dismissed because EEOC complaint alleged only a failure to promote); Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995) (hiring, promotion, and training discrimination claims dismissed where EEOC charge alleged only discriminatory discipline).

As noted above, Mrs. Evans' first EEOC complaint stated that she engaged in a consensual, sexual relationship with Mr. Elliott.  She complained that she was discharged when Dr. Williamson found out about the relationship.   There are no allegations within the EEOC complaint that Mrs. Evans was forced to engage in a sexual relationship or that she applied for and was denied any promotions.  Additionally, an investigation into the facts alleged in the EEOC complaint  would not

lead to the discovery of the claims Mrs. Evans subsequently raised in her complaint to this Court. Accordingly, Mrs. Evans has failed to exhaust her administrative remedies as to her quid pro quo and failure to promote claims, and those claims should be dismissed pursuant to Rule 12(b)(6), Fed.R.Civ.P.  However, even if Mrs. Evans did exhaust her remedies, her quid pro quo and failure to promote claims still fail on the merits because the evidence in the record is insufficient to create a genuine issue of fact for a jury as to those two claims.

### *Quid Pro Quo Claim*

To prove a quid pro quo claim, a plaintiff must show: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action. Spencer v. General Electric Co., 894 F.2d 651, 658 (4th Cir. 1990), overruled on other grounds by Farrar v. Hobby, 506 U.S. 103 (1992).

The fourth element requires a tangible employment action.  Plaintiff must show that the "acceptance or rejection of the harassment was an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment." Id.  "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  De minimis job detriment is

-21-

insufficient to satisfy the fourth element.  See Kauffman v. Allied Signal, Inc., 970 f.2d 178, 187 (6th Cir. 1992).

Mrs. Evans testimony is inconsistent as to whether the sexual relationship she had with Mr. Elliott was consensual.   In portions of her deposition, she admits that the relationship was consensual.  See e.g. Evans Deposition at 39-40.  In other portions, she states that she did not want a sexual relationship with Mr. Elliott.  See e.g. Evans Deposition at 48.  As discussed in more detail below regarding the hostile environment claim, she fails to show the sexual relationship was unwelcome.  Also, Mrs. Evans has put forth no evidence that the relationship with Mr. Elliott affected tangible aspects of her compensation, terms, conditions, or privileges of employment.  She was employed by the college from May of 1997 to May of 2002.  According to Mrs. Evans, the last sexual encounter she had with Mr. Elliott was in May of 2000.  Her contracts for temporary employment continued to be renewed for two years after the last time she allegedly had sex with Mr. Elliott.  In addition, there is no evidence in the record that she was ever eligible for any increase in her compensation or in her privileges of employment.  Therefore, Mrs. Evans claim of quid pro quo sexual harassment fails.

### *Failure to Promote (Disparate Treatment) Claim*

To prove a prima facie case of discrimination for failure to promote, Mrs. Evans must prove that (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.  Taylor v. Virginia Union University, 193 F. 3d 219, 230 (4th Cir. 1999).

-22-

There is no evidence in the record that Mrs. Evans applied for and was denied a promotion. There is also no evidence in the record that there were any promotions available to Mrs. Evans during the time that she was employed by the College. As such, there is no genuine issue of material fact for a jury to decide, and Mrs. Evans' failure to promote claim fails.

**_Unlawful Termination (Disparate Treatment) Claim_**

Mrs. Evans' asserts that her contract was not renewed because of her gender, that her employment was terminated but Mr. Elliott's was not. The first three elements of Mrs. Evans' prima facie case of gender discrimination have been met: (1) she is a member of a protected class, i.e., female; (2) Defendants concede that she was qualified for her job and performed it satisfactorily;[7] and (3) she faced an adverse employment action in that her contract as an adjunct professor was not renewed. However, Mrs. Evans has not met the fourth element of whether other employees not within the protected class were retained under apparently similar circumstances.

Mrs. Evans must establish that "other employees" were similarly situated in all relevant respects; that they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F2d 577, 583 (6th Cir. 1992)(citing Mazzella v. RCA Global Communications, Inc., 642 F.Supp. 1531 (S.D.N.Y.1986), aff'd, 814 F.2d 653 (2d Cir.1987); Lanear v. Safeway Grocery, 843 F.2d 298 (8th Cir.1988) (plaintiff must prove that he and the white employee were similarly situated in all respects

---

[7]Defendants assert that Plaintiff was fired because of the inappropriate behavior she exhibited several days prior to her termination. Whether or not this alleged conduct reflects on whether or not she was performing her job satisfactorily is not raised by Defendants.

-23-

and that the other employee's acts were of comparable seriousness to his own); Cox v. Electronic
Data Systems Corp., 751 F.Supp. 680 (E.D.Mich.1990)); Radue v. Kimberly-Clark Corp., 219 F3d
612,617-18 (7th Cir. 2000)(holding that plaintiff must demonstrate that the same supervisor was
involved in comparable situations to demonstrate disparate treatment of similarly situated
employees); Stanback v. Best Diversified Products, Inc., 180 F.3d 903,910 (8th Cir. 1999)(same);
Shumway v. United Parcel Serv., Inc., 188 F.3d 60,64(2d Cir. 1997)(employees were not similarly
situated because they were not supervised by the same person).[8]

Mrs. Evans appears to argue that the non-renewal of her contract was based upon the fact that
she engaged in a sexual relationship with Mr. Elliott.  Both Mrs. Evans and Mr. Elliott were under
the supervision of Dr. Williamson and, according to Mrs. Evans' argument, both engaged in a sexual
relationship with the other.  However, Mrs. Evans admits that she did not tell Dr. Williamson of this
sexual relationship until she was called into his office to fire her.  Dr. Williamson had no knowledge
of the relationship between Mrs. Evans and Mr. Elliott until after his decision to fire her for her
erratic behavior.  Mrs. Evans also argues that Mr. Elliott exhibited behavior similar to hers but he
was not fired for such behavior.  Mrs. Evans asserts that Mr. Elliott once yelled at another employee
while in the conference room at the College.

Mr. Elliott, as Dean of Instruction, was not subject to the same standards as Mrs. Evans, an
adjunct professor.  Mr. Elliott was a Dean and a full-time employee of the College.  Mrs. Evans, on

_____

[8] There is no published Fourth Circuit case on point; however, the Fourth Circuit has
cited with approval the precedent in this string cite in the unpublished cases of Flateau v. South
Carolina Commission for the Blind, 2002 WL 31553805 (4th Cir. 2002); Heyward v. Monroe,
1998 WL 841494 (4th Cir. 1998); and Edwards v. Newport News Shipbuilding and Dry Dock
Co., 1998 WL 841567 (4th Cir. 1998).

the other hand, was a part-time professor who was only extended a contract on an as-needed basis each semester. Additionally, Mrs. Evans was employed as a professor and Mr. Elliott was not. Also, Mrs. Evans does not deny the "erratic, odd, bizarre" behavior just before she was fired, some of which occurred in the presence of students. While she asserts Mr Elliott yelled at an employee on a prior occasion, the evidence reveals dissimilar circumstances.[9] Accordingly, Mrs. Evans and Mr. Elliott were not under "similar circumstances." Thus, Mrs. Evans has failed to set forth a prima facie case of gender discrimination.

Assuming, arguendo, a prima facie case had been established, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action suffered by Mrs. Evans. Defendants meet this threshold by asserting that Mrs. Evans' contract was not renewed due to inadequate enrollment and her erratic and menacing behavior, as evidenced by the language in the standard agreement for temporary employment, the depositions of Mr. Elliott and Mr. Williamson, their memos to Mrs. Evans' file, and the memos of other employees of the College regarding Mrs. Evans' behavior.

Finally, the burden shifts back to Mrs. Evans to demonstrate by a preponderance of the evidence that the legitimate reasons produced by Defendants were not the true reasons, but were pretext for discrimination. Plaintiff has failed to present any evidence to move this issue past the summary judgment stage.

---

[9]On one occasion, Mr. Elliott yelled at full-time faculty member in the conference room at the College. Williamson Dep. at 33-34. Dr. Williamson was present at the time and testified that he was not aware of anyone else who heard Mr. Elliott yelling on that occasion. Williamson Dep. at 34.

"Once the moving party has met its burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir.1992). Mere beliefs, conjecture, speculation, or conclusory allegations are insufficient to defeat a motion for summary judgment. Id. and Doyle v. Sentry, Inc., 877 F.Supp. 1002, 1005 (E.D.Va.1995). Plaintiff has failed to present any evidence to demonstrate that Defendants' true reason for deciding not to renew her contract was not the decline in enrollment and her erratic behavior but, instead, the sexual relationship she allegedly had with Mr. Elliott. By Plaintiff's own admission, Dr. Williamson did not know of the sexual relationship between Mr. Elliott and Mrs. Evans until he had her in his office to fire her. Therefore, summary judgment is appropriate as to this claim.

***Hostile Work Environment Claim***

To establish a hostile work environment claim based upon sexual harassment, Mrs. Evans must prove that the offending conduct "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree v. Scollon Prod., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

As noted above, Mrs. Evans' testimony regarding her relationship with Mr. Elliott is inconsistent. At times in her deposition, she stated that she did not want to have sex with Mr. Elliott and that she felt pressured because he was her administrator. Evans Dep. at 29, 48-49. At another point during her deposition, she stated that her relationship with Mr. Elliott was consensual. Id. at 40. In fact, in her initial charge of discrimination, she sets forth that she "had a consensual

-26-

relationship" with Mr. Elliott. Ex. 10 to Defendants' Motion. A need to determine which version of a plaintiff's testimony should be believed does not create an issue of fact. Waste Management Holdings, Inc. v. Gilmore, 252 F.3d 316, 341 (4th Cir. 2001). To determine whether the conduct was unwelcome, the inquiry is "whether respondent by her conduct indicated that the alleged sexual advances were unwelcome." Meritor Savings Bank v. Vinson, 477 U.S. 57, 68 (1986). Mrs. Evans has not produced evidence sufficient to establish that the relationship she had with Mr. Elliott was unwelcome.

Mrs. Evans alleges that she was sexually harassed by Mr. Elliott because, although she was attracted to Mr. Elliott, he was her administrator and she felt pressured to do what he wanted her to do to please him. Evans Dep. at 29. When the offending party is the plaintiff's supervisor, the employer will be strictly liable where the harassment culminated in a tangible employment action. Faragher, 524 U.S. at 807. As stated above, "a tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761. Although Mrs. Evans' contract was not renewed in May of 2002, the causal connection between that employment action and her relationship with Mr. Elliott is tenuous at best. Mrs. Evans testified that her last sexual encounter with Mr. Elliott was in May of 2000. Evans Dep. at 59. Therefore, Mrs. Evans' hostile environment claim as it relates to her relationship with Mr. Elliott is without merit.

To the extent that Mrs. Evans is asserting a hostile environment claim as a result of the treatment she received from Monica Elliott's friends, that claim fails as well. Again, to establish a hostile work environment claim, a plaintiff must show: (1) the conduct was unwelcome; (2) it was

-27-

based on the plaintiff's gender; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer.  Spicer v. Virginia, 66 F.3d 705, 710 (4th Cir. 1995)(en banc).

According to Mrs. Evans, Monica Elliott and her friends harassed her because Monica was jealous or felt threatened by Mrs. Evans.  See, e.g., Evans Dep. at 42  ("Well, basically, Mrs. Elliott got me fired because she was suspicious of my relationship with her husband."), Id. at 42-43 ("She got her friends to write false statements about me to get me fired to keep me away or separated from her husband forever to save her marriage.  She saw me as a threat.  I was no threat.") and Id. at 54 ("[The discrimination] is based on the sexual affair that I had with Rusty Elliott, the Dean of Instruction because of his wife's jealousy of me.").

While the treatment she received from Monica Elliott's friends was unwelcome, it is not actionable under Title VII because it was not sufficiently severe or pervasive to alter the plaintiff's conditions of employment to create an abusive work environment.  It was not physically threatening or humiliating nor did it unreasonably interefere with her work performance. While being watched and talked about is certainly uncomfortable, it does not rise to the level of a Title VII violation. "Title VII is not intended to serve as a workplace civility code, is not designed to purge the workplace of vulgarity, and does not countenance a federal cause of action for unpleasantness." Jennings v. University of North Carolina, at Chapel Hill, 444 F.3d 255, 269 (4th Cir. 2006), citing Faragher, 524 U.S. at 788.  Additionally, the conduct was not based upon Mrs. Evans gender but, if anything, the fact that she was Mr. Elliott's paramour.

In <u>Platner v. Cash & Thomas Contractors, Inc.</u>, 908 F.2d 902, 903 (11th Cir.1990), the wife of the business owner's son became "extremely jealous" of one of the female employees, suspecting that her husband and the female employee, Platner, were having an affair. The owner of the business became aware of the conflict and terminated Platner because he "perceived this as a threat to his son's family unit," despite the fact that Platner had been an otherwise satisfactory employee. <u>Id.</u> at 903-04. The Eleventh Circuit affirmed the dismissal of Platner's Title VII claim, emphasizing that "the ultimate basis for Platner's dismissal was not gender but simply favoritism for a close relative." <u>Id.</u> at 905. Several District Courts have reached the same conclusion. <u>See</u>, <u>e.g.</u>, <u>Kahn v. Objective Solutions, Int'l</u>, 86 F.Supp.2d 377, 382 (S.D.N.Y.2000) (no Title VII action where employee who had consensual sexual relationship with her employer was fired at the insistence of his wife); <u>Campbell v. Masten</u>, 955 F.Supp. 526, 529 (D.Md.1997) (no Title VII action where employee who had consensual sexual relationship with her supervisor was fired because he saw her as a threat to his marriage); <u>Freeman v. Continental Technical Serv., Inc.</u>, 710 F.Supp. 328, 331 (D.Ga.1988) (no Title VII action where employee who had consensual sexual relationship with her boss was fired when she became pregnant).

In light of the above analysis, Mrs. Evans' hostile work environment claim fails.

***Retaliation Claim***

To prove a claim for retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse action. <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 365 (4th Cir. 1985).

-29-

To establish "protected activity," a plaintiff must show that she opposed an unlawful employment practice which she reasonably believed had occurred or was occurring. <u>Bigge v. Albertsons, Inc.</u>, 894 F.2d 1497, 1503 (11th Cir.1990); see also <u>Ross</u>, 759 F.2d at 355 n. 1 (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of discrimination was in fact meritorious in order to prevail). "The inquiry is therefore (1) whether [plaintiff] "subjectively (that is, in good faith) believed" that the district had engaged in a[n] [illegal practice], and (2) whether this belief 'was objectively reasonable in light of the facts,' a standard which we will refer to as one of 'reasonable belief.'" <u>Peters v. Jenney</u>, 327 F.3d 307 (4th Cir. 2003)(citing <u>Weeks v. Harden Mfg. Corp.</u>, 291 F.3d 1307, 1312 (11th Cir.2002)).

The Supreme Court has described an adverse employment action as one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Burlington Indust., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998). In order for plaintiff's belief to be objectively reasonable, it must include an objectively reasonable belief that an adverse employment action has occurred.

In order to establish the requisite causal connection, plaintiff must proffer evidence which establishes that she would not have suffered an adverse employment action but for her protected activity. <u>Hopkins v. Baltimore Gas & Electric Co.</u>, 77 F.3d 745, 755 (4th Cir. 1996).

In the present case, Mrs. Evans alleges that Mr. Elliott retaliated against her by having her arrested for stalking once he found out that she had received a Notice of Right to Sue from the EEOC. However, Mrs. Evans filed her EEOC charge on November 5, 2002, almost six months after

-30-

the College decided not to renew her contract. She received her Notice of Right to Sue in June of 2003 and was arrested for stalking on October 22, 2003. Mrs. Evans had not been employed by the College since May 16, 2002. Therefore, she did not suffer an adverse employment action as a result of her filing an EEOC charge because she was not employed by the College at either the time she filed the charge or at the time she was arrested. She was not an "employee" at the time. Therefore, this claim fails as well.

In conclusion, as to all of Mrs. Evans' claims of discrimination under Title VII, she has failed to present facts from which a reasonable juror could conclude that Defendants discriminated against her based on her gender.

### Section 1983 Claim

In order to state a cause of action under 42 U.S.C. § 1983, a plaintiff must show that (1) the defendants deprived him or her of a federal right, and (2) did so under color of state law. See Gomez v. Toledo, 446 U.S. 635, 640 (1980); see also Hall v. Quillen, 631 F.2d 1154, 1155-56 n. 2 & 3 (1980). Because the United States Constitution governs only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes "state action." Blum v. Yaretsky, 457 U.S.C. 991, 1002 (1982). To qualify as "state action," the conduct in question "must be caused by the exercise of some right or privilege created by the State or by rule of conduct imposed by the State or by a person for whom may fairly be said to be a state actor. Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).

Discrimination claims involving public employment brought under 42 U.S.C. § 1983 are analyzed the same as a claim brought under Title VII. Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir.

-31-

1994); Holder v. City of Raleigh, 867 F.2d 823, 828 (4th Cir. 1986). Therefore, for the reasons set forth above, Mrs. Evans' § 1983 claim fails as well.

***Intentional Infliction of Emotional Distress***

South Carolina recognizes that "one's wilful, malicious conduct proximately causing another's emotional distress may be actionable" as intentional infliction of emotional distress or the tort of outrage. Ford v. Hutson, 276 S.C. 157, 161, 276 S.E.2d 776, 778 (1981). To state a claim for intentional infliction of emotional distress, a party must establish (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain or substantially certain such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) the actions of defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. Bergstrom v. Palmetto Health Alliance, 358 S.C. 388, 401, 596 S.E.2d 42, 48 (2004). "Initially, it is for the trial court to determine whether the defendant's conduct may be considered so extreme and outrageous as to permit recovery, and only where reasonable minds might differ should the issue be submitted to the jury." Williams v. Lancaster County School Dist., 369 S.C. 293, 302, 631 S.E.2d 286, 293 (2006) (citing Hainer v. Am. Med. Int'l, Inc., 320 S.C. 316, 324, 465 S.E.2d 112, 117 (Ct.App.1995)).

Mrs. Evans claims that the treatment she received from other employees at the College was distressful to her. She claims that Mr. Elliott's wife and her friends talked about her and constantly monitored her actions. Evans Deposition at 46-47. However, neither Mrs. Elliott nor her friends are

-32-

defendants in this action and Mrs. Evans has failed to present any evidence to suggest that the actions of those employees should be imputed to the College or Mr. Elliott.  In addition, although constantly being monitored by other people may be uncomfortable, it certainly cannot be described as "atrocious and utterly intolerable in a civilized community."  Furthermore, in the light most favorable to the plaintiff, the "treatment" Mrs. Evans received was a result of her sexual relationship with Mr. Elliott.  No reasonable mind would find the "treatment" so "extreme or outrageous" under the circumstances.  As such, Mrs. Evans' claim for intentional infliction of emotional distress cannot survive summary judgment.

### RECOMMENDATION

For the foregoing reasons, it is **recommended** that Defendants' motion for summary judgment be granted in its entirety.

 s/ Thomas E. Rogers, III     
Thomas E. Rogers, III
United States Magistrate Judge

**The parties' attention is directed to the important notice contained on the following page(s).**

-33-